which is Luzinski, no that's Ms. Luzinski, sorry, it's Allstate v. Coroniti. I can tell everybody in the courtroom this is a hot court. If you've heard that and you haven't been before us, I'm telling you as a matter of fact. We have read the briefs. We have not discussed the cases with each other. But if we stop you in the middle of your argument, it's because we have questions and not because we haven't fully read and understood your positions. Okay, Ms. Luzinski. Thank you. Good morning. May it please the court, my name is Christine Luzinski and I represent the appellant, Dennis Coroniti, who was the defendant in the proceeding below. I'd like to reserve two minutes for rebuttal. That's granted. In October of 2000, Mr. Coroniti was driving a 1988 Chevy Suburban which was insured under an Allstate policy. He sustained serious injuries in that accident and in fact the injuries were so serious that even Allstate's own vocational expert admitted his wage loss alone was in excess of $600,000. It is undisputed in this case that the 1988 Chevy Suburban was insured under the Allstate policy and had $100,000 per vehicle stacked limits under that policy. What is disputed is the total amount of coverage available to Mr. Coroniti. Mr. Coroniti contends it's $400,000 and Allstate contends it's $200,000 because two of the four vehicles had only comprehensive coverage. Well, he suspended the coverage voluntarily, didn't he? That is not exactly... But he didn't pay for it either, right? The key to the case is Mr. Coroniti's testimony at page 547 of the record where he said that what he did is he told the insurance agent he wanted all four vehicles insured but that he would not be driving two of those vehicles. At all times in this case, Mr. Coroniti believed that he had underinsured coverage on all four vehicles. How could he believe that when he paid something like $22 for one and $27 for the other? Mr. Coroniti... the argument and the mantra Allstate has advanced in this case is that Mr. Coroniti did not pay for the coverage. The problem with that is in any case involving insurance coverage, that is not... the case is not as simple as that. Under the motor vehicle law, there are very specific protections provided to insurers as far as forms that have to be signed and protections that are given for both the insurance company and the insured state. And when those protections are not followed, the coverage is mandatory. Are you referring to sections 1731 and 1738? Yes. Those only apply to liability, not comprehensive. Isn't that right? No. The law under 1731, it says that any motor vehicle liability insurance policy, which this is clearly a liability insurance policy, liability coverage, shall not be issued or delivered with respect to any motor vehicle in the Commonwealth unless there's uninsured and underinsured limits stated therein. And so the policy as a whole is a liability insurance policy. What Allstate did in this case is try to obtain a de facto waiver of underinsured coverage and stacking on two of the four vehicles without following the protections under 1731 and 1738. And those protections were designed to prevent exactly the situation that occurred here. If... the one thing that is clear is this case was... the dispute in this case and the fact that I'm standing before this court today was 100% preventable by Allstate. Allstate had opportunities at the time it issued the policy, before it issued the policy, and after it issued the policy to completely avoid this dispute. What they did is they issued a policy that has in the policy itself, it states $100,000 of coverage for each of the four vehicles, each of which are listed separately. The Allstate policy, if you take the policy literally, Allstate's saying we're trying to parse the policy. If you read the policy exactly as it was written by Allstate, it states when there is a stated limit in the declaration page, the sum of the limits is what your coverage is, which here is $400,000. Allstate could have prevented this entirely by either stating the limits for those two vehicles were zero or not applicable or changing the way they wrote the definition. But what Allstate now seeks to do is to blame Mr. Cornidi and Mr. Cornidi's counsel for Allstate's self-created problem. The irony of that situation is that Allstate is going to stand before this court and say Mr. Cornidi's interpretation is not reasonable. The irony of that is that Allstate's first party adjuster, who the court found in Allstate did not appeal, told Mr. Cornidi the coverage was $400,000 to UIM adjusters. What did the district court do? I'm sorry? What did the district court say? This is an appeal from a district court decision. The district court did two things. First, it denied Mr. Cornidi a Seventh Amendment right to a jury trial by granting summary judgment on various issues. Well, wait a minute. If he was entitled to summary judgment, the Seventh Amendment doesn't apply. I mean, that's been held throughout the country. So you don't have a right to a jury trial if the other party gets summary judgment, right? I mean, as a general principle of law. If it's properly granted. Well, that's a different question. But what the court said was resolve factual and legal issues in the summary judgment. Then what you're saying is that the court shouldn't have granted summary judgment, not that it deprived him of his jury trial, Seventh Amendment jury trial. Exactly. And they did deprive him on the estoppel issue of his right to a jury trial because the remedy sought was legal in nature. And even on the estoppel issue, he was entitled to a jury trial. One of your main issues is ambiguity, moving to the legal argument. Aside from that, the ambiguity part of it, there are two aspects of error by the district court there. First of all, the law of the Pennsylvania Supreme Court, starting with standard Venetian blind and the Bateman decision, which are cited in our brief, says that where there is an ambiguity in an insurance policy, not a regular contract, the ambiguity must be construed in favor of the insurer and must be construed in favor of coverage. This circuit on cases in our reply brief, cited at pages 11 to 15, has a host of decisions discussing that very proposition. And, in fact, in the two cases, one of which is Debarra's, I think, DeVue? DeFabio? There's two cases which clearly address this issue head-on that say, DeBarlow's and AC&S, that say that in the insurance context, not a regular contract case, where there's an ambiguity, it must be construed in favor of the insurer. Can we go back to the question that one of my colleagues asked you about whether Section 1731 is applicable? And you said, I think you said, well, it's applicable even though the policy only, in this case, as to the two vehicles, was comprehensive coverage. Didn't the Pennsylvania Superior Court say just the opposite in Calhoun? In the Calhoun case, the Nationwide v. Calhoun case is distinguishable because the focus of the court, if carefully reviewing that decision, was that the owner of the vehicle was not the same person who had the policy. So the owner of the vehicle had no, quote, motor vehicle liability insurance policy, which is the key to 1731. Here, the owner of the vehicle was Mr. Poroniti. He had, with Allstate, a motor vehicle liability insurance policy. And because the court in Calhoun, which is a Superior Court decision and obviously not controlling here, but – Yes, but we have since said that when – that we certainly defer to the highest court in the state that reaches the issue when it's within that court's jurisdiction. And this case didn't go to the Supreme Court. It doesn't take, by and large, insurance cases. They leave it to the Superior Court. And every once in a while, the Pennsylvania Supreme Court acts. So it is the Pennsylvania Superior Court that's been making the applicable law in insurance cases. Because, Your Honor, the Superior Court said several times throughout the opinion that the owner of the vehicle was not the same person who had the policy, and they were focusing on that, it leads to the conclusion where the owner of the vehicle, like this case, is the person who has the policy 1731 would apply. Just – I want to touch briefly on the estoppel. Well, can I just ask you about the ambiguity? I mean, the court found it was ambiguous, right? Exactly. And once the court found that, what our argument is, is that under stand-admonition blind, under Bateman, under the cases listed in our brief on pages 11 to 13 of our – or 11 to 15 of our reply brief, it was mandatory that that be construed in Mr. Cornyn's favor. Well, I mean, is that the end of the inquiry? I mean, what do we do then? Doesn't our case in Pacific Community v. Lynn say, let's look to some extrinsic evidence? The court in that case, if I'm recalling that case correctly, extrinsic evidence can be used to determine whether an ambiguity exists. But once it is determined that an ambiguity exists, it must be construed in favor of the insured. And the reason for that is we have all state here who has superior bargaining power. You have an unsophisticated insured. This is the – Well, he had an agent. He wasn't dealing alone with – And the agent never explained to him that any of the – all state says they explain the advantages and disadvantages of coverage. That is not in this record. Isn't the effect of saying it was ambiguous to allow extrinsic evidence – That's what we're saying is the key to that. And wasn't the extrinsic evidence in this case the fact that Judge Chigaris pointed out that he asked for comprehensive only? That is not the actual testimony. The testimony at page 547 of the record is that Mr. Cornetti asked his agent – Excuse me. Can I have page 547? Go ahead. For all four vehicles to be insured, but that he would not only be driving two of those vehicles. The agent had no recollection of one of the transactions. She was just surmising what occurred. And the other transaction she didn't even handle, and there was no testimony from the person who handled that. So there's no contrary testimony from the agent in this case. If you look at the agent's testimonies at 412 and 414 and 417. Go ahead. The – on the estoppel issue, the one – I'm sorry. Before you go on to that, in 12th Street Gym, we stated a court will only construe ambiguous language against the drafter in the absence of relevant extrinsic evidence. If we considered extrinsic evidence in 12th Street Gym, don't we have to do so here? In 12th Street Gym, this court did not directly address the issue that I'm bringing up today, which is the conflict in the Supreme Court cases, which say it's an automatic interpretation in favor of the insurer. The case that 12th Street Gym cited for that proposition was not an insurance case. I agree with you, but don't we have to follow 12th Street Gym? Isn't that something – let's assume for a minute that 12th Street Gym was erroneous because of the distinction that you make, that it relied on a state court case that was not an insurance case. Under our rules, we're clearly bound to follow 12th Street Gym unless the en banc court reverses it, are we not? The appellant in that case did not bring before the court the argument that I am making. The court could not have made a holding, a binding holding, on this issue that is now before this court, especially when the two prior cases of de Barlos and – But 12th Street Gym was an insurance case. But the court didn't address – if the party before that court didn't ask the court to resolve the legal issue that is being presented before the court in this case, in other words, standard Venetian blind indictment and the Supreme Court say that where there's an ambiguity, it must be construed in favor of the insured. And the conflict that is created – like in other words, I want to say that 12th Street Gym was either dipped up or the court didn't address the issue head on, which is what we're asking this court to do. We're asking this court to look at standard Venetian blind indictment and then look at the Third Circuit cases of de Barlos and AC&S cited in our brief and resolve that issue, which 12th Street Gym did not have an opportunity to do because the issue wasn't before them. Whether they made a sweeping statement and relied on a non-insurance case, they didn't have to resolve that conflict. The last point I'd like to make on the Estoppel case is if you look at the district court's findings in this case and you look at the fact that the Superior Court found that Allstate did not appeal and cannot challenge now the fact that Allstate should have used more precise language in drafting the policy, that Mr. Cornetti's interpretation of $400,000 in coverage was reasonable, that the First Party Adjuster-Keeper had in fact told him in May of 2002 that coverage was $400,000, that then Allstate strings him along for a year and a half believing that coverage is $400,000. I think your red light is on. Oh, there it is. Yes, there it is. So we'll hear the rest of you. Why don't you finish your sentence and then we'll hear you. One sentence. It's just that if you add all of those things together, the district court came to 2 plus 2 equals 5, and I'll explain that in my rebuttal. Okay. Thank you. Thank you. When I practiced before this court, I was always amazed how quickly 12 minutes or 15 minutes could go. Time flies when you're having fun. Oh, yeah. Good morning. May it please the Court, my name is Alan Goulding. I am here on behalf of Allstate. It's encouraging to see that what we did not lose sight of is the fact that in this particular circumstance, Mr. Coronetti made a conscious choice not to have underinsurance motorist coverage on two of the four vehicles that he insured. I was trying to figure out how much more would his insurance have been over the period at issue had he gotten the UIM on all four cars, on the two that are at issue. I'll answer that question by comparison. I don't know because each vehicle obviously rates differently. Nobody figured that out. I don't think so. But looking at the premiums for the other two vehicles that were insured that had full coverage including liability and UIM, one of those was $373, the other was $320. And he paid $22 and $27. He paid $22 and $27. So on one of the vehicles for which he had only comprehensive coverage for eight years, he would have paid an additional $300 per year of coverage. The other would have been another $300 as well. But he made a conscious choice not to have that coverage. And what he asked the trial court to do was to rescue him from his own decision, was to award him benefits that he did not want and did not pay for. And the trial court refused to reform his policy, and this court should do the same. I'm not sure that I would be able to address every issue that's been raised by the appellant in this matter, but let me be guided by some of those questions that I presented to counsel. But first with respect to the ambiguity argument, the trial court exercised basically a two-pronged analysis of whether or not the policy was ambiguous. They at first looked at the policy themselves. Before you get into that, your adversary actually raised a good point in her brief. I mean, you didn't cross-appeal here, and yet you were arguing that the district court erred. How do you respond to that? I know you didn't have a chance to respond to it. Yes, we did not cross-appeal. We found ourselves in that, I guess, frequent dilemma where the ultimate decision was favorable to our client, and we obviously did not wish to disturb that. But I don't think you can complain at this point that they made an error, right? Well, I'm not complaining so much that the court made an error. What I'm saying is there were two prongs to the court's analysis in determining whether an ambiguity exists. He did not determine that the policy was ambiguous. What he determined was... He being the trial court. He being the trial court, and I apologize. The trial court determined that if you look solely at the policy, there were two reasonable interpretations of the policy. Now, we disagree with that. We think that the interpretation advanced by Mr. Coronetti requires that you parse out portions of the declaration page. Nevertheless, the court then did exercise the appropriate method of evaluating whether an ambiguity exists by employing the issue of extrinsic evidence. And in doing that, he then looked at the extrinsic evidence, determined that there was no reasonable dispute about the fact that Mr. Coronetti walked into his agent's office and asked for comprehensive coverage only, and determined that based on that, an ambiguity did not exist, and he denied the defendant's motion for summary judgment on that defense. We asked your friend on the other side about that, and her construction of what happened was that he didn't do that. Can you show us or tell us where he asked for just coverage on the two cars? I don't have the site at my fingertips. It is indicated in our brief and also recited in the trial court's memorandum decision that Mr. Coronetti did specifically respond to questions and said when asked about whether he had sought to decline coverage on two of the vehicles that he said, I suppose I did to save money on premiums. That was in his debt, right? That's correct. It was in his deposition, and it was that which was presented to the court along with other portions of his deposition and the agent's deposition from which the court said there really isn't any question but the fact that Mr. Coronetti simply requested coverage on only two of those vehicles. And from that, it then determined that an ambiguity did not exist. And as I recall, the agent said, but if you keep them in the garage, you'll want at least comprehensive, something like that. Correct. He indicated to the agent that he did not intend to use the two vehicles and the agent recommended then keep comprehensive on it so that in the event of vandalism or fire, the vehicles are protected. He made the choice to do that, and as we know, he paid very minimum premiums for those things. Their response to the judge's approach to resolving the ambiguity is to say that he should not, no, not he could not, consider the extrinsic evidence. That simply is incorrect. And the court has mentioned a couple of the cases where this court as well as appellate courts in Pennsylvania have employed the method of first looking at the documents to determine, are there two reasonable interpretations? If there are, is there extrinsic evidence that would allow us to resolve the dispute? The cases that they report generally do not have any indication that extrinsic evidence was presented to the court, so the decisions were made based solely on the documents. How do you respond to your adversary's argument that the quotation that I recited from 12th Street Gym is not essential to the decision, it's just dicta that does not supersede what we said in the DeBurlos case in the mid-'70s? And I can kind of respond to that backwards if I may. The DeBurlos case cites the Selle case, which is cited by the trial judge in his case, which says that extrinsic evidence can be considered. And then he goes on to reference the Hyonas case that talks about the fact that you should just look at the policies to make that decision. When you examine the Hyonas case, what that court acknowledges is that no extrinsic evidence was presented to it. And, in fact, it says that we hold, therefore, that because the defendants failed to offer any proof of the insurer's awareness and understanding of the exclusions in the policies, the policies must be construed in favor of the insurer. It anticipated or considered the possibility that extrinsic evidence could have been presented to it, but the Hyonas court did not have to face that. So the DeBurlos decision acknowledges that under Selle that the extrinsic evidence should be considered and then acknowledges also that under Hyonas, if it is not, the only thing it can look at is the policy. The St. Paul case, which is cited in this court, makes specific reference to the fact that you must consider extrinsic evidence in the event that there's been a decision that the police capable to intercept. But let me stop you for a minute because I think you went a little too quickly in DeBurlos. We stated there there is no need in an insurance case to take that extrinsic evidence. That's a pretty clear statement that would favor your adversary's position in this case, would it not? What it says, continuing the quote, the policy was enunciated in Hyonas. In the Hyonas case, as I just read, there was no extrinsic evidence presented to the court. The court did not have extrinsic evidence but anticipated that had it been presented, it would have considered that, but it simply did not. I would contend that in the face of that information, this statement is not complete in DeBurlos. Going forward then to this 12th Street gym case, Judge Sirica, when he authored this opinion, specifically references the fact that there was a construction of the contracts that were made. In fact, immediately preceding what I'm about to read to you, he makes reference to the standard Pernichian blind case, and then he says, but a court will only construe ambiguous language against the drafter in the absence of relevant extrinsic evidence. It occurred within the context of an insurance case. That's what this case is about. It's about what coverage a person is entitled to under medical policy. I can't imagine how we can say that in insurance cases you can't consider extrinsic evidence when, in fact, that's what this court does, and it does it routinely. So contra profferentum is just the default rule if there's no other evidence that answers the question. If the court has not presented extrinsic evidence, and the only thing it has to rely upon are the documents themselves, and there are two reasonable interpretations, the interpretation will be that it is ambiguous and it will be interpreted against the insurer or the drafter, whoever that may be. Let me move on to the issue about 1731. I think our position is very clear on that. It is, in fact, tracking the Nationwide v. Calhoun case. Mr. Pernich chose not to have liability coverage or UAM coverage on two of his vehicles. The Calhoun case specifically says the policy covering Calhoun's vehicle was not underlined a motor vehicle liability insurance policy and thus did not provide for any coverages for bodily injury, much less for liability. And in stating the law, they don't talk about anything about the fact that it may have been a third-party insurer or owner, as your adversary stated. Correct. And the trial court determined that to be a distinction without any difference. It made no difference with respect to the application of whether or not 1731 or 1738 waiver forms were needed. If you don't purchase liability coverage and have only comprehensive, those forms are not necessary. As a matter of law, in fact, the Superior Court said. As a matter of law, correct. Both the insurers and the insurers are obligated to follow that in Pennsylvania. The Superior Court has acted on that. That law has been in place since 1943. There really isn't any contrary to that. However, if I can, there's a corollary to follow up on that. What Mr. Coronetti is asking this court to do, if they were to adopt his position, is to reform his policy to give him coverage, UAM coverage, consistent with his liability coverage. Well, there is no liability coverage. He made a choice to do that. So he's saying, reform it then to another vehicle. Now, that's a relief that simply doesn't exist in the statute and simply this court would go well beyond the statute to try to give relief of that nature. In his brief, Mr. Coronetti claims that he was deprived the right to a jury trial on the estoppel issues. I think we've addressed that fairly well in our brief, but let me point out to the court that after the trial court presented the cross motion for summary judgment, which both parties contended there were no material facts in dispute, he ruled upon most of the defenses raised by the defendant. The only one that was preserved for trial was the estoppel issue. And that was the only thing that was presented to the court for a resolution on the facts. The court ruled against Mr. Coronetti on the laches argument before trial, correct? Yes, I mean, it wasn't truly presented in the briefing. I can't argue that the court ruled on it so much as it wasn't really addressed much in the motions for summary judgment. It was resurrected, I think I used that term, resurrected at trial, but at trial, the arguments were the same. There was no separate evidence or testimony on laches or unclean hands. The evidence all pertained to these equitable defenses. But wasn't there evidence in the record, though? It seemed to me clear that for nearly two years Allstate wrongly believed that Mr. Coronetti had $400,000 in coverage, and it quite frankly seemed like a comedy of errors on your client's part. And for purposes of Mr. Coronetti's laches argument, how can we conclude that the delay occasioned by that comedy of errors was not attributable to Allstate? I'm not sure what the damages might have been, but I thought the district court's laches analysis, which incorporated by reference I think pages 6 to 11 in an earlier decision, was entirely unpersuasive. Here's the approach that I think the court adopted in which we advanced. The laches argument is that Allstate's failure to provide the insurance information caused a delay in Coronetti's understanding of the amount of his policy. But the court rejected this argument because Mr. Mulcahy, Attorney Mulcahy, who represented Mr. Coronetti... He didn't rely on it. ...asked for the information, was provided certified copies of the policy, candidly admitted that he was charged with the duty of looking at those independently evaluating what the coverage was. Well, I think that saves you on a stopple because when the attorney said I wouldn't have relied on them because I had an independent duty, then Mr. Coronetti's lost his reliance element of his stopple claim. But on his laches claim, your agents telling Mr. Mulcahy that there's $400,000 in coverage continued to lead him down the primrose path of getting experts and trying to prove up a case that was worth $400,000, which he may not have done had he known up front that the case was only worth $200,000. I would take issue with your statement that the agent told him there was $400,000 worth of coverage because that simply did not occur. Mr. Mulcahy conceded that he did not know what Allstate's position was on coverage. He independently made his evaluation after receiving the certified copies of the policy. He was not aware of Allstate's position on coverage. They're a mistake. What you're saying is it's a comedy of errors but unknown to Mr. Coronetti. Mr. Coronetti and his attorney... At least those litigation... Attorney Mulcahy did not know what Allstate's position was. Likewise, Allstate did not know what Mr. Mulcahy's position was until he sent a demand letter 18 months after he asked for the UIN... So, I mean, granted, they changed their course or re-evaluated or whatever. I mean, was there really a delay? Don't they have to... There was a delay. Okay. The delay, they argue, is that they didn't provide the information timely. The court looked at it and says, yes, they did. They provided him a certified copy of the policy within days of asking for it. But that certified copy was contradictory, right? Well, if you parse out portions of it, yeah. That policy, at the same time, said he had coverage on all four vehicles and also said it was suspended. It was... I thought that document was internally contradictory, which is why the district court properly considered extrinsic evidence. Do you want to answer that and then your red light is on? Yes, if I may. Yes, sure. I would disagree with you, Your Honor. I don't believe that you could say the document is inherently inconsistent if you look at the entire document. However, be that as it may, the extrinsic evidence that reveals that there was no real dispute about the fact that Mr. Coronetti had only comprehensive coverage on two of the vehicles was obtained from Mr. Coronetti, who was obviously available to Mr. Mulcahy. Mr. Mulcahy admits that he looked at the declaration page, saw the words suspended, and gave it no effect. Okay. That's just an unreasonable position. Thank you. Thank you very much. Ms. Linehan, I would appreciate it. Would you explain to us your laches argument? I'm not sure that you... Sure, Your Honor, and there's the... You only have two minutes, but... The lack of due diligence here for laches as well as the negligent inducement for estoppel, and they tie in together, is not what the district court found or what's been argued today. It is the declaration sheet and policy itself is the failure to exercise due diligence. Well, that's not a laches argument. What is your laches argument? What was the delay? The delay is that... And how long was it? And how was your client prejudiced? When Allstate issued this policy, they never... The lack of due diligence is they didn't write the policy clearly to begin with. Mr. Mulcahy didn't read this policy. That's not a laches argument. What is the laches argument? I mean, that's your contract argument. Allstate told... It's been represented here today that there was no representation of Allstate's position in Mr. Coronetti. The district court found otherwise. The district court found, in fact, that Ms. Kiefer, the first-party adjuster, told him it was $400,000 and that Ms. Levan had a duty to tell him beyond merely giving him the declaration sheet in June of 2002. The district court, again, not appealed by Allstate, said in June 2002, Allstate's first-party adjuster had a duty  under the Pennsylvania insurance regulations what the coverages were. And a year and a half after that... I'm going to use the presider's authority to say, will you please answer the question? Give us very clearly what your laches argument is. The laches argument is from June of 2002 to February 2004, there was a delay arising from Allstate's lack of due diligence to not only properly... Due diligence is not usually used in this context, so you're throwing me off by that. But go ahead. I'm reading from the definition of what laches is. It's a delay arising from the opposing party's failure to exercise due diligence in the Coder case and Stilt case. Yeah, a failure to do what? It says they failed to exercise due diligence. It's not what Allstate knew, but what Allstate might have known by the information within its reach. Yeah, but they have to investigate these claims, right? Whether it's 200, 400, or something in between. Don't they have to investigate? I mean, where's sort of the undue... Prejudice. Well, the prejudice and the delay. If it had been disclosed to Mr. Cornete's counsel... He would have done what? He wouldn't have prepared to defend... He would have filed a declaratory judgment action first before spending $10,000. And we're talking about premiums here today. You get $50 for... But is there anything extraordinary about the delay? I mean, it seemed to me it got investigated all the way through, according to the facts, and then at the 11th hour, somebody up the ladder said, hey, you're wrong. The delay is a year and a half, because if they had told him in June 2002, before Mr. Mulcahy spent a penny on the underinsured case, and $10,000, you know... He wouldn't have spent it for $200,000? He wouldn't have needed to, because the testimony of Mr. Mulcahy, and our expert, is that Mr. Cornete's past wage loss loan, based on his tax records, and based on the fact that Allstate paid his full first-party wage, was $200,000. He wouldn't have needed... But you said at the outset of your argument that his wage loss was over $600,000. If his wage loss was over $600,000, why do you need all the experts? Even if there's $400,000 in coverage, you know you're well beyond that on the wage loss claim. So why would you have incurred any expense by hiring experts? Mr. Mulcahy testified that he would have gotten a vocational expert, potentially, to prove something to Allstate, but he wouldn't have gone beyond that and gotten an economic expert to project them out to a million dollars. Yeah, but you've already bought the policy, right? I mean, you were already well beyond the policy limits. Why did you have to spend... Isn't that what you're saying? To prove... In other words, there's a big difference in a U.N. case between $400,000 and $200,000 worth of coverages. $200,000, yeah, that's big. In other words, if his tax returns alone supported $200,000 in past wage loss, maybe Mr. Cornyn's counsel said he would have gotten a vocational expert and spent that money, but he wouldn't have gotten an economist, he wouldn't have needed to get an independent physician and pay a deposition fee to that physician because he had the treating physicians that already supported that. I think we understand your argument. Thank you. Thank you very much. Thank you both. We'll take it under advisement. Sasha, you want to come get this so it doesn't... We'll hear counsel in Cornerstone versus Nickel Logistics.